When you're ready, Counsel. Good morning, Your Honors. Jeffrey Dickerson from Reno, Nevada. On behalf of the appellants, we're here today to argue a case that's on appeal from summary judgment from Judge McKibben's court. Judge McKibben granted summary judgment, finding that there was no public policy in play with respect to the conduct of my clients that led to their discharge. We maintain that there's a genuine issue of material fact in that regard. First, there's a legal issue, however, and that is whether or not we are seeking to enforce the TIP statute, if you will, that underlied this particular matter. And the question there is, are these people in the same boat as in the Moen case or in the Nunez case where those plaintiffs were seeking to enforce the provisions of that statute? And I gather your argument is, even though in the end it was ruled against your client as to what the statute meant, they could seek to enforce it not knowing what the result was going to be. Yes. The law in Nevada is clear that as long as they had a reasonable perception, and I think there's an issue of fact as to whether or not that's the case. Could I ask another question going to the endgame? Your clients were dismissed for violating company policy by taking the TIPs or the TOCs out, quite contrary to the company policy, correct? Not the way they interpreted it, Your Honor. Well, okay. So you think that's a disputed issue of fact? I think it is a disputed issue of fact. They did not take the TIPs contrary to company policy? Well, they took the TIPs. The question is whether that was contrary to company policy. Okay, I'll let you get to it, but let me just ask this then. If that were the case, that that is that it was contrary to company policy and they were dismissed for that ground, perhaps also in retaliation or sanctioning for trying to enforce the TIP policy, does Nevada have a mixed motive rule so that as long as there's a legitimate ground for the termination, that would be the end of the story? No mixed motive in Nevada, Your Honor. It's the proximate cause. The question, though, I submit is whether the evidence that we submitted to call into question the rationale creates an issue of fact as to whether or not those other motives were in play legitimately or exclusively the motive of retaliation was in play. So you'd have to prove that there was no – what would be your burden of proof to prove to get around the ostensible termination for violating company policy? Well, because there's no mixed motive case in Nevada, we don't have the shifting legitimate non-discriminatory reasoning and pretext, but it kind of merges into the same causation analysis. We have temporal proximity to supply the prima facie, if you will, causation, and I think Your Honors are familiar with how close in time all of these events went down in relationship to the termination three years ago in three days. But we've also put forward issues of fact with respect to the rationale that the employer had put forward. For instance, they say the whole basis was this policy, and my clients in discussing it with management said, could you please provide us with the policy? We'd like to see this policy that you're telling us about in writing. Where is this corporate policy? Every time that this company has a policy that deals with personnel issues, it's issued in a – they get a copy of it, and they never got a copy of it. There's a question there as to whether or not this policy even existed. Well, it existed in the sense of telling this is what we want you to do. They didn't get a piece of paper that said it. Can I come back to Judge Fisher's question? This is just a straightforward question of Nevada law rather than the facts of this case for a moment, and that is I'm not asking you to concede any facts or whatever. I'm just trying to figure out the Nevada law. If it turns out that the employer was partly motivated by what it viewed as the violation of company policy as to withholding tips and violation of company policy by not telling the truth as to whether they were withholding tips, if that was part of the employer's motivation, do you lose? I think we do. That's the mixed motive question. I want to just make sure I understood your answer. But again, I would submit that the different evidence that we put forward to call into question whether that was part of the motivation, which motives were in play, that's inherently a jury issue. And so I think – No, I didn't ask you to concede the facts. I just want to understand the legal question. Yeah. I think if we go back to the beginning, because Judge McKibben stopped there. He didn't get to these questions. These questions are important because it's de novo review, and this Court is determining whether or not all around the summary judgment was inappropriate. And I understand that that's your – the call to your question. I submit that there are issues of fact as to whether causation is met here. But on the – back to the legal issue, I mean, this is not a situation like in Nunez or Moen where the plaintiff is here in this case seeking to enforce the tip statute. Not the case. This is a retaliation case based upon that conduct, and that distinguishes Moen and Nunez. And it makes it more akin to the case of Jones v. Western Minerals, which is cited in our brief. And in that case, if you remember, the employee had – just had surgery, and his doctors told him not to go near the cyanide heap leach pits at the mine. And his boss ordered him to do so, and he refused to do so. The Court found the public policy in that – because he was terminated. The Court found the public policy in that case to be founded upon Nevada's OSHA statutes, which have remedies. They have administrative remedies, and they even have remedies for retaliation. And that employee instead came to court. And the Nevada Supreme Court said the public policy is enunciated. That's where we find it. The fact that the – that Western States argues that he can go administratively and get his relief isn't the question here. The question here is, is that public policy in place? Is that – is the fact that he has an administrative remedy exclusive? No, it's not. And even – and in that case, the OSHA regulations provided for anti-retaliation. So if he had a retaliation claim based upon his report, he could have filed an administrative complaint with OSHA. Can I ask a factual question? I'm trying to figure out what facts are undisputed in this case. I think it's undisputed, but I want to make sure you have a chance to tell me that they may be. That these employees are graveyard shift employees, and that the practice prior to the announced policy of we're withholding your tips and we'll pay them out to you later without interest and so on. I mean, I understand the nature of that objection, which they lost, but they announced this policy. But prior to that time, there was no tokes committee that got separate compensation out of the tips for the graveyard shift. That is to say, that was the established policy prior. Then the announced policy comes in from the company. Then these employees, after protesting, I will assume in good faith, that, hey, wait a minute, this is not in compliance with Nevada law because you're, among other things, keeping the interest for yourself. They then start paying themselves as the tokes committee, which was not the previous policy, and they don't tell the employer that they're doing this. Are those facts correct and undisputed? It's close, but it's, I think, if I could just correct the end. Yeah, no, please do. That's why I'm asking this. The end part there is, before this policy came into play, the graveyard shift would take their tokes down and divide them equally. The bylaws say no extra pay. There was no extra pay. They interpret that to mean that somebody on that shift gets more pay than the others based upon serving on the tip committee. That didn't happen before. Before, they took all of the tips. Afterwards, in order to engage in partial compliance with the policy, they submitted some of the tips but maintained their previous practice of dividing the other part equally. So, again, nobody received extra pay under the bylaws, but they did. But they withheld money that previously, on the extensible ground, that they were paying themselves as part of the tokes committee. Am I correct in understanding that they did not tell management that they were doing this? I think there's an issue of fact as to whether management knew. That's a different question. I asked, did they tell management that they were doing this? The thing that I can think of right now is in one of the meetings with Tim Trenton, who's the manager, Mr. Bronkin said, we're going to be the highest paid dealers in Nevada. And Trenton responded to that, well, you do what you got to do. And I think a reasonable juror could infer from that that the two were communicating. The two were communicating in the sense that we're going to continue doing what we were doing, and we might modify it a little bit, but we're going to continue doing it. And we're going to go get an outside legal opinion about this. And Trenton said, do what you got to do. So your argument is, no, they were on notice that they were going to do this. OK. May I ask one quick question? I know your time is running out. That's fine, Your Honor. Sure, our presiding judge will give you an extra minute or so. I want to understand Nevada law, particularly the Ollam case, where it justifies a public policy, tortious discharge action, in that rare and exceptional case where the employer's conduct violates strong and compelling public policy. Why is this that kind of case? This is that kind of case, Your Honor, because it's not a private or proprietary matter. It's internal disputing with management, discussion, discourse with management concerning an issue that arises from rights that all employees in that institution and all employees among the various properties of Harris have. The evidence before you is that it wasn't just this graveyard shift. This was a concern of everybody on every shift as to this new policy. And there were people from the other shifts involved in this discourse as well. Thus, it's not personal to these plaintiffs. It's a statute of the law. Well, I wouldn't say it's not personal to them. They're concerned about the rest of money. I mean, it's a statute of the law. It's a tortious discharge case where the public policy isn't coincidentally personal because you're talking about depriving somebody of their livelihood employment. So necessarily, any situation that we have, no matter what law we're talking about or public policy that we're talking about, you're going to have a personal aspect to it. That's not what I mean. What I mean is, is there a public good that's being served by their conduct? And the public good being served was to ensure that this policy that affected a broad range of people was being done legally under Nevada law. All right. Thank you. Thank you, Your Honor. You've run over your time, but we've occupied a fair amount of our questions. You can have a minute or so in rebuttal. Thank you, Your Honor. Good morning, Your Honors. I'm Susan Heaney Hilden representing Harris. This case is about employees who failed to comply with the legal policy that Harris implemented at the request of the IRS to track and tax actual dealer tip income. This is not the kind of case that merits a public policy claim under Nevada law. Did the IRS request or require that Harris keep the interest on the tips? Your Honor, they did not. And there's actually evidence in the record. And there was some objection not only to the Harris people keeping the tips, but there was some objection that the interest on the tips would be kept by Harris. Correct. And in the record, there is an affidavit from a Harris individual named Harry Heck who explains that the tips were placed in a depository non-interest bearing account. There has been no contrary evidence submitted by the appellants in this case. And I submit that that's undisputed. Oh, I see. Harris was not. So Harris takes the money and puts it in a non-interest bearing account, thereby ensuring that the money doesn't come to them either. Right. Well, hey, it's such a deal. OK. But the goal, as you know, and the appellants testified that they were told this, that the goal was to track and tax actual dealer income. And of course, all the dealers were upset about this. This is also in the record. They testified they didn't like the policy. Why? Well, I think we can all agree that part of it was they were going to be taxed on their actual tip income, which they weren't before. And it's a less favorable deal for them. So part of the whole objection and what the appellants did in this case is to avoid taxation of actual income. And their conduct. This is not an income tax case. It is not. But I mean, I think that that's an important aspect to look at when you're considering a public policy case. Well, your Nevada Supreme Court has in a case, Wilsey v. Baby Graham, declared that no public policy is more basic than the enforcement of our gaming laws. So isn't this part of the Nevada gaming law structure? You know, I would submit that it's not. It's actually in the wages structure. It deals with enforcement and regulation of what employers are allowed to do with regard to employee tips. It's not regulation of gaming regarding, you know, ensuring that the public is not cheated in gaming. And I know that in the Wilsey case, it wasn't clear what the gaming law was. There was no discussion of what the specific gaming law was that was being enforced. Well, as I read Wilsey, it seemed to say the public policy exception is geared toward illegal or unsafe practices. Is that correct? Right. And I mean, I think that's a key issue here. I mean, the Nevada Labor Commissioner has specifically investigated what Harris is doing, which, by the way, is in conjunction with what almost all Nevada casinos are being forced to do by the IRS. And the Nevada Labor Commissioner has held that it does not violate Nevada statute. So, you know, there is no public policy at issue here. And I can't point to simply the existence of a statute to say that's sufficient public policy. Well, you can't say that there's no public policy at issue. So long as there's a good faith dispute as to the meaning of the law, I would think that the employees have a right, and in fact, Nevada has a public interest in allowing them to pursue remedies against what they view, at least for a time, is a violation of the law. Now, if it turns out they're wrong, they're wrong. But until they know that, it seems to me that there is public policy. Whether it's strong enough is a different question. Well, there is no case recognizing that, and they cannot cite a case recognizing that. The Nevada Supreme Court has only recognized the public policy exception, and this is as stated in Appellant's brief, in four cases. Two of those cases involve termination of employees for filing workers' comp cases. And the Nevada Supreme Court rationale was clear and it was fair. It says there were these comprehensive workers' comp laws, these regulate, you know, payments to injured workers, and the employer benefits from these laws as well because they don't are they aren't liable in tort for these accidents. So it's not fair to say that employers can get away with firing employees who file workers' comp claims. Yeah. Are you saying to me that under Nevada law, there is no public policy that protects an employee against termination for good faith attempt to enforce Nevada law? It can't be just any law. It has to be for good faith attempt to enforce a law and this is the element. Well, that's right. That was part of my hypothetical, that it was a good faith attempt. Okay. And I am not quibbling with the good faith attempt. I agree that Nevada law can protect employees who make a good faith attempt to enforce a law, whether that law turns out to be or to enforce something, whether it turns out that they were mistaken or not. But that attempt has to involve a sufficiently compelling public policy. And Allum is clear. It has to involve public health, safety or the general welfare. Now, here I would submit that there is nothing involving public health, safety or the general welfare. And again, I go back to the cases in which the Nevada Supreme Court has found and then declined to recognize a public policy exception, because I think they are illustrative and they show that this case doesn't involve that. There is the workers' comp cases they recognized it. Allum they recognized the exception where an employee was terminated for. Can I ask my question in a different way? Okay. Let's assume that there was no attempt by these graveyard employees to pay themselves as a toke committee after the Harrah's policy is announced. Let's assume instead that they instituted litigation and administrative complaints to challenge the new Harrah's policy and Harrah's fired them. What's the result? Okay. I think in that case, you know, first of all, that's a totally different case. That's not what happened. I'm not asking you to concede the facts. I'm asking you on this hypothetical, what's the result under Nevada law? I think it is somewhat unclear, but I think you could say there still was not a sufficiently compelling public policy. In other words, your argument is even if all we have is an undisputed good faith attempt by these employees to enforce Nevada law, Harrah's can fire them for that. Well, yeah, unless there's a statute to the contrary. That is at will employment. Okay. I understand the position. And I submit also that there is, you know, there's another the Nevada Supreme Court has explicitly refused to recognize public policy termination cases in a number of cases where there were reasons besides just is it a sufficiently compelling public policy. And I think the Chavez v. Seavers case, the 2002 case, is important to look at in that. There, the court, the employee alleged he was terminated for racial discrimination. He alleged racial comments and conduct. And the court said, you know what, and he didn't summon the Nevada statute because that requires that an employer have 15 employees. And so instead, he said, I'm going to make a public policy claim. I'm going to use this tort claim, and I'm going to use that statute as the basis. That's going to be my public policy basis. And the Nevada Supreme Court recognized, look, racial discrimination is invidious, it's terrible, but we're going to adhere to what the Nevada legislature said when they said employers have to have at least 15 people to be liable for a termination for race discrimination, that's what they meant, and we're not going to let this employee, who may very well have been subjected to race discrimination, pursue a tort for termination in violation of public policy. And that was in a case where there was clear public policy. Here, you have a statute dealing with tip income that these employees acted in a dishonest way to clearly go around a policy. Kennedy, you're moving away from the hypothetical. I think we're all trying to wrestle with the notion of what Nevada law does in terms of public policies. Let me ask you a variant of it. What remedy did they have if they believed that and there was they didn't self-help at all? What remedy did they have? Their remedy was to pursue a complaint with the Nevada Labor Commissioner. And the Labor Commissioner could have done what? And the Labor Commissioner could have instituted an action if the Labor Commissioner deemed fit. And they did that, and they did that, and Harris fired them for doing it. No, Harris wasn't. No, I'm saying, in the hypothetical, then what? That's okay under Nevada law? I think that that is an unsettled question, Your Honor, but I would submit that you still have to look to, was there a compelling public policy? Well, I come back to the notion that maybe the quote in Wiltsi, I don't want to take it out of context, but obviously, the Supreme Court does recognize that the gaming institutions of Nevada are very important. And this is the employees of those gaming institutions. So I find it a little hard to just say Nevada would blink and say, oh, it doesn't make any difference. This is just employees disputing their wages, even if one of the major hotel operators there, casino operators, is taking out their money, holding it, whether or not you put it in an interest-bearing account, they aren't getting the money right away. The Nevada Supreme Court has refused to recognize termination and violation of public policy claims when there is a statute that delineates a specific remedy and does not allow a private right of action. And that is the case here. What's the remedy? There's no remedy for that. The remedy is pursuing a claim with the labor commissioner. There's no remedy for the – there is no way that they can get relief if they pursue that avenue and Harris punishes them for doing it. It's counter – you know, it's just counterintuitive. But, Your Honor, that's not what happened. I mean, if you look at the facts, I'm sorry. Well, I want to step back and say that you can tell – the reason that we know that's not what happened is because all the dealers complained. All the dealers went to management and complained. Not just these graveyard dealers. A number of dealers from other shifts sought legal counsel. The letter to the labor commissioner complaining was written on behalf of all dealers, not just the graveyard dealers. It didn't mention these. On the other hand, the argument might be made that as soon as these graveyard dealers do this, bingo, Harris says, we finally have an excuse to do what we wanted all along, and these other guys, we don't have an excuse. That the retention of the tokes was a pretext, in other words. That's the argument they're making. Well, these employees acted dishonestly. They didn't tell management what they were doing. They all testified they knew what the policy was for. They understood the policy. They basically came up with a clever way, they perceived, to get around this policy. And when management discovered this, it fired them. I mean, what would you have management do? If that's not allowed, what is? This is their – they are terminating employees for acting in direct subordination. And that's the Wayman case that says – You're assuming the conclusion. And the question is, if you prove that, you may be correct on the outcome. The question is, are there disputes of fact as to whether your scenario is accurate or not? I'm basing all of my statements on their own testimony. And that's what I always do in a summary judgment case. I take exactly what the plaintiffs say. The question is not what their motivation is. The question is what's Harrah's motivation. And their testimony as to Harrah's motivation is indirect evidence at best. Correct. And if I may, just the Nunes case, you know, they have argued that that case is inapplicable because in that case they say that the employee is pursuing under the statute. And keep in mind, that statute terminates employers from – or I'm sorry, prohibits employers from terminating employees based on a spotter. Now, in the Nunes case, the Court clearly held that because there's no private way to act. We've read the Nunes case. Okay. And I just think, you know, they're trying to do the exact same thing the employees did in Nunes, and the Court flat-out rejected that. And the employee – Thank you. Okay. Okay. Okay. You've gone over 2-1⁄2 minutes, but you don't get 2-1⁄2 minutes in rebuttal. Let's start with one and see what happens. Your Honor, unless you have any questions, I think we'd submit. Okay. Thank you. Thank both sides for an interesting and good argument. Yeah. Thank you. The case of Bacchus v. Harris Entertainment is now submitted for decision.
judges: D.W. Nelson, W. Fletcher, Fisher